OF

## OREGON

## OCTOBER TERM, 1891.

[Filed February 1, 1892.]

$\begin{vmatrix} 22 \\ 47 \end{vmatrix}$ $\overset{3}{178}$

## CHAS. H. DODD *v.* THE HOME MUTUAL INSURANCE COMPANY.

INSURANCE— SPECIFIC PERFORMANCE— RENEWAL OF POLICY— FAILURE OF PROOF.— A complaint which seeks to enforce specific performance of a parol agreement for the delivery of a new policy of insurance, to ascertain the plaintiff's loss thereunder, and decree a recovery of the amount thereof, is not supported by testimony tending to show a renewal of a former policy.

EQUITY JURISDICTION — FAILURE OF EQUITY — REMEDY AT LAW.— The rule that equity having assumed jurisdiction of a case for one purpose, will retain it for all purposes and administer complete relief, does not apply where there is a failure of proof of plaintiff's equity, but he will be remitted to such remedy as he may have at law.

ON REHEARING.

SUPPRESSION OF FACT— UNFAIR CONTRACT.— The suppression or failure to disclose a material fact, although through ignorance of the fact, or without intent to deceive, may render a contract so hard, or unequal, or unfair, that a court of equity will refuse to enforce the same against the party thus misled.

Multnomah county: L. B. STEARNS, Judge.

Defendant appeals. Reversed.

After alleging that the plaintiff is doing business un-der the name of C. H. Dodd & Co., and the defendant is a corporation, the complaint proceeds: "That on the twenty-eighth day of May, 1889, the defendant issued to the plaintiff its policy of insurance, numbered 305,900, where-in and whereby it did insure the plaintiff against all direct loss or damage by fire to the amount of one thousand dollars upon his stock of merchandise, consisting princi-pally of agricultural and other machinery, implements, vehicles, engines and boilers, threshers, horse-powers, head-ers, hay-presses, wind-mills, farm- and spring-wagons, bug-gies and carriages, attachments and extra parts to the above, belting, hardware, and machine supplies of all kinds, all while contained in the frame building known as Chas. H. Dodd & Co.'s warehouse, on the west side of Main street east of Grand street, Pullman, Washington Territory, now the state of Washington; that said policy by its terms ex-pired on May 28, 1890, at noon; and before the expiration of the same, defendant agreed with plaintiff to renew said policy for the period of one year, towit, from noon on the twenty-eighth day of May, 1890, to the twenty-eighth day of May, 1891, at noon, and to insure plaintiff against all direct loss or damage by fire for the term of one year from the twenty-eighth day of May, 1890, at noon, to the twenty-eighth day of May, 1891, at noon, to an amount not exceeding one thousand dollars, on plaintiff's stock of merchandise, consisting principally of agricultural and other machinery, implements, vehicles, engines and boil-ers, threshers, horse-powers, headers, hay-presses, wind-mills, farm- and spring-wagons, buggies and carriages, attachments and extra parts to the above, belting, hard-ware, and machine supplies of all kinds, all while con-tained in the frame building known as Chas. H. Dodd & Co.'s warehouse, on west side of Main street east of Grand street, Pullman, Washington Territory, now state of Wash-ington, and to execute and deliver to plaintiff a policy of

insurance thereon in the usual form of policies issued by them, for the sum of one thousand dollars, for the term of one year, aforesaid, and the plaintiff agreed to pay the defendant therefor the sum of $48.75, as premium, and to pay such premium on demand; that it was then agreed between plaintiff and defendant that said insurance should be binding on the defendant for the term of one year, commencing at noon on the twenty-eighth day of May, 1890, and ending on the twenty-eighth day of May, 1891; and defendant thereupon agreed with plaintiff to execute and deliver to him within a reasonable time a policy of insurance upon said property in the usual form of policies issued by said company, insuring said stock of goods in the sum of one thousand dollars against loss or damage by fire, and that plaintiff should pay as the premium therefor the sum of $48.75, and pay the same on demand; that the defendant, by a policy of insurance in the usual form of policies issued by said company, among other things, did promise and agree with plaintiff to pay to plaintiff such loss and damage as he might sustain should the said property be destroyed or damaged by fire during said time, commencing May 28, 1890, and ending May 28, 1891, not exceeding one thousand dollars; that the property was destroyed by fire July 3, 1890; that plaintiff has been ready and willing at all times since said agreement was made, and still is ready and willing, to pay to defendant the sum of $48.75, the premium agreed upon, whenever demand should be made for the same, and did, on July 19, 1890, duly tender and offer to pay said sum to the defendant, and demanded of the defendant that it issue a policy of insurance as agreed upon, but the defendant refused to accept or receive said sum of money so tendered, or to issue said policy of insurance as it promised, and still does refuse to accept or receive said premium, and to issue said policy of insurance, and plaintiff brings said sum of $48.75, the premium agreed upon for such insur-

ance, into court, and tenders the same to defendant. The plaintiff has fulfilled all the conditions contained in the usual form of policies issued by defendant, and on July 19, 1890, and before the commencement of this action, and within the time required by such policy, made proof of his loss and demanded payment of said sum of one thousand dollars, but defendant has refused and still does refuse to adjust said loss, and refused and still does refuse to pay said sum or any part thereof; that plaintiff has no plain, speedy, or adequate remedy in a court of law, etc.

"Wherefore plaintiff prays that a specific performance of the agreement to insure plaintiff against loss or damage by fire to his property hereinbefore described, be decreed; that defendant be compelled to issue to the plaintiff a policy of insurance on his said property in the usual form of policies issued by it in the sum of one thousand dollars, for the term beginning May 28, 1890, and ending May 28, 1891; that defendant be compelled to adjust plaintiff's loss and damage by said fire, and that plaintiff have judgment against the defendant for one thousand dollars; and for such other relief as to a court of equity may seem meet in the premises," etc.

The defendant demurred to the complaint on the grounds — first, that the complaint does not state facts sufficient to constitute a cause of suit; and, second, that the plaintiff has a complete and adequate remedy at law upon the matters in said complaint alleged; which demurrer was argued and taken under advisement by the court; but the record fails to show that any disposition was made of the same. The defendant's answer admits the issuance of the policy, which expired on the twenty-eighth day of May, 1889, but each of the other allegations of the complaint is denied. Upon the trial the court below found the facts in accordance with plaintiff's allegations, and rendered the decree prayed for in the complaint, from which this appeal was taken.

*Dolph, Bellinger, Mallory & Simon,* for Appellant.

*Cox, Teal & Minor,* for Respondent.

Strahan, C. J.—There was some disagreement between counsel at the argument as to what the complaint contained; but that there should be no mistake on that point, the statement is made from the record and not from counsel's brief.

This is a suit in equity to enforce a parol agreement alleged to have been made between the plaintiff and the defendant for the delivery of a policy of insurance on the plaintiff's stock of merchandise, situated at Pullman, Washington, for one thousand dollars, and to ascertain plaintiff's loss thereunder, and for a decree for one thousand dollars. There are other allegations in the complaint; but its nature and object must determine its character. To obtain the specific performance of the alleged agreement, is the only foundation for the interposition of equity, and it therefore becomes necessary to examine whether or not the plaintiff has sustained, by a preponderance of the evidence, his allegations on that subject.

The plaintiff and his book-keeper are the only witnesses offered whose evidence is relied upon. The plaintiff testified in substance that Arthur Wilson was defendant's managing agent in Portland, and that he always came in before the insurance policies expired, and asked if they were to be renewed, and that plaintiff always renewed; never denied him at any time that witness could remember; remember a policy which had expired May 28th for one thousand dollars on the stock at Pullman; Mr. Wilson came to the store in the regular way and asked for a renewal of the insurance that the Home Mutual Company had with plaintiff, alleging at the same time that they had lost a small policy on us at Spokane, and we certainly ought not to go back, and asked that the policy be renewed. The policy was renewed at once, and plaintiff told him to renew all our insurance. He

further testified in effect that he placed no insurance at Pullman through any other person except Mr. Wilson, and that there had been no change in the rates, and the terms were for one year; that the Pullman policy was precisely the same kind of a one as the Walla Walla, and for three years the policy of the company has always been ordered in that way; that he had been in business twenty-five years, and had never given a written application; that the premium was payable sixty days after the insurance, and he had always been ready to pay it.

Witness continued: "July 3, I issued the order to the book-keeper to go through the insurance. We were very busy on other matters, and July 4th was next day after. We look up all insurance about that time, and go through the policies. We also received a telegram about half-past three, July 3d. I was upstairs in the type-writer office dictating, and the chief book-keeper brought up a telegram; also brought up the policies on the Pullman property, and brought the notice of the renewal that had been made in the Mutual, but did not remember the policy. I told him to see Arthur Wilson, as we only knew Arthur Wilson in this matter, and to tell him the policy had not been issued. He went to the office and returned and said Arthur Wilson was not there. I replied, 'We know nobody in this matter but Arthur Wilson; you find Arthur Wilson and bring back this policy indorsed by Arthur Wilson.' The renewal was made on the twenty-eighth of May. He brought it back exactly as ordered." He further testified that the renewal was for the same amount on the same subject matter at the same rate of premium, which amount was payable on the twenty-eighth of July. On his cross-examination, he says he did not advise the book-keeper to tell Arthur Wilson that the property had been destroyed by fire; that the former policy on the Pullman property was not issued through the company's agency at that place; that he kept an insurance book, but did not know whether it showed

Downing's name opposite that policy or not, but did not think it did.

Mr. H. C. Johnson, the plaintiff's book-keeper, also testified in substance: "It is a part of my business to look after the insurance. I know Arthur Wilson, secretary of the Home Mutual Insurance Company. Remember Arthur Wilson being in the store two or three times, soliciting a renewal of insurance which he had. I heard him ask Mr. Dodd for a renewal of insurance, and Mr. Dodd told him he could renew it. I can trace back the record of insurance with the Home Mutual for three years. The business was done with Mr. Wilson. I recollect the policy for one thousand dollars expiring May 28, 1890. I understood it was one of the policies to be renewed. I was looking over the policies in June, the general practice, when I found we were short two policies, one in Laidlaw's company and one in the Home Mutual Company; and I started out to look it up and see why it had not been brought here. I went to Laidlaw's office—for some reason did not go to Wilson's; that slipped my mind. The next time that policy came into my mind, or the fact of its not being renewed, was on the afternoon of July 3d. We had a telegram that there had been a fire at Pullman, and I started to look up all insurance, and found we were short this policy, and called Mr. Dodd's attention to it, and he told me to go and ask the company if they would cover that thousand dollars. I went to the office of the company, and did not see Mr. Wilson there. I saw another gentleman I took to be Mr. Bush. He seemed to be in authority, and instructed the book-keeper to make the policy. I had two policies with me and asked him if those policies—in conversation—if they were covered in the policy. I had the Walla Walla policy. He asked me if I could not find the policy. I told him no; not for Pullman. He said, 'all right, you are covered,' and instructed the clerk; 'you are covered.' (Witness here recognized the endorsement then

·made by the clerk on the policy.)    He wrote on the policy ·'covered,' and signed his surname, 'Moffett.'    I brought the policy back and told Mr. Dodd.    He said he knew Mr. Wilson better than anybody else in the matter, and told me to find Mr. Wilson, if I could, and ask him if our policy was covered, and get the endorsement.    I looked in the directory and found where Mr. Wilson boarded, and went to his boarding-house about six o'clock and inquired for him, and they said go to his room, and I showed him the policy.    When told we had no new policy in place of that, he said he didn't know how that occurred.    I asked him if we were covered, and he said we were covered.    I asked him to mark it on the policy, and he did so.    This is what ·Wilson wrote on the policy: 'It is understood this policy is in force from May 28, 1890, for one year    Arthur Wilson.' Mr. Wilson had no objections to writing this on the policy; .he seemed anxious to say the policy was in force, and ·would make it in force as far as he could."

On his cross-examination, this witness testified among ·other things in effect: "I did not say anything to the gentlemen in the office about the fire.    I kept that a secret from them, and went back to Mr. Dodd, who said he knew Count Wilson, and knew his authority, and wanted me to .go and get the endorsement of Count Wilson.    I did not mention to Mr. Wilson about the fire when I saw him at his room."

Mr. Wilson testified that he was secretary of the defendant company in the month of May, 1890.

The defendant called Mr. Moffett and Arthur Wilson, who contradicted much of what was testified to by the plaintiff and Johnson, except as to the calls made at the office and at Mr. Wilson's private room by Mr. Johnson, .and as to these their version is not at all favorable to the plaintiff.

The evidence offered on the part of the plaintiff tends ·to a limited extent to prove that there was a verbal agree-

ment between the plaintiff and the defendant for the renewal of policy 305,900 for one thousand dollars, on the plaintiff's stock of merchandise at Pullman, which was to expire by its terms on the twenty-eighth of May, 1890, and not for a new policy to be issued on that property; also that the policy was renewed by the endorsements. The renewal of a policy is quite another and distinct thing from the issuance of a new policy.

Says Wood on Fire Insurance, § 139: "When a policy of insurance is renewed, the renewal stands upon the same ground as the original policy and subject to the same defenses. Not only is the policy, but all the elements upon which it was predicated are continued in force, and it is treated as having been upon the same grounds, representations, and considerations that dictated the issue of the policy; and if any change is agreed upon or intended, it must be expressed in the renewal, or it cannot be relied upon without a reformation of the receipt, as a renewal receipt is a contract and receipt, and is only open to parol proof except so far as it fills the office of a receipt." And in the same section the author continues: "A policy of insurance may be continued in force by a subsequent contract made before, at the time of or after the policy had expired. Such a continuance in force of a policy differs from a new contract of insurance, as by it the original contract is kept up; and in case of loss, the original policy is the basis of action in connection with the contract of renewal or continuance."

All that Johnson did under plaintiff's directions in calling at the defendant's office and upon its secretary at his private rooms, was to obtain some recognition or acknowledgment that the old policy was continued in force and not a recognition of a previous or present agreement to issue a new policy. In that view of this record, and the evidence in support of the plaintiff's allegations, the plaintiff has wholly failed to satisfy us by a preponderance of the evi-

dence that the defendant undertook or promised to issue and deliver a policy on the Pullman property; and this alleged agreement being the sole ground of the plaintiff's equity, the suit must fail in its main purpose for that reason.

But the plaintiff contends that having proceeded thus far with this inquiry, and having reached a conclusion adverse to him on the equitable aspects of his case, we ought to retain the case and determine the questions of fact upon which the defendant's legal liability may be supposed to depend.    There is a numerous class of cases where, if equity takes jurisdiction for one purpose, it will retain the cause for all purposes and administer complete relief; but having found against the plaintiff's equity, that rule has no application.    If we had found that the defendant agreed to issue the policy, and had refused, we might have decreed specific performance, and then we could, as incident to the equitable relief to which the plaintiff would have been entitled, have ascertained the amount of plaintiff's loss and decreed that defendant pay the same.    (*Phœnix Ins. Co.* v. *Ryland*, 69 Md. 437.)    But where the equity entirely fails, we think it better to dismiss the suit and leave the party to pursue such legal remedy as he may be advised.

We do not determine whether there was a renewal or not, nor the effect of the endorsements on the old policy. These are all questions of fact, which belong properly to the legal forum, and we cannot voluntarily assume to decide them.    Besides, the machinery of a court of law is better adapted to their determination than that of a court of equity.

It follows that the decree appealed from must be reversed, and the suit dismissed without prejudice as to any legal rights that may be involved in the record.

[Filed February 22, 1892.]

On Rehearing.

Strahan, C. J.—Counsel for the respondent have presented a petition for a rehearing, mainly on the ground that the court mistook the term "renewal," used so frequently in the evidence, and that we should have held that the parties meant by the use of that term the issuance of a new policy and not the continuing of the old policy in force. It is true that in some parts of the plaintiff's evidence something was said about a new policy, but the great body of the evidence refers entirely to a renewal. In addition to this, the sending of the book-keeper to the office of the defendant company and to the private residence of the secretary of the company with the old policy with directions to procure the endorsements on the policy showing the renewal, we think indicate what was the plaintiff's intention and understanding too clearly and conclusively to admit of any controversy. This much may be said conceding the plaintiff's entire sincerity in the transaction; but if we are compelled to rely upon that transaction or any part of it as a basis for equitable relief, the same cannot receive the approval of the court. The plaintiff through his book-keeper sought to secure a renewal of the old policy or evidence on that subject by concealing the material fact then within his knowledge: that the property at Pullman had been destroyed by fire on that day; and it was because of that knowledge that he would tolerate no delay; Arthur Wilson must be found, and the endorsement must be procured before the company could probably learn of the fire. Was there any reason for this concealment and silence other than an intent thereby to overreach the defendant? In such case the plaintiff may be exonerated of all fraudulent intent, and in this class of cases the result would be the same. The suppression of a material fact, or the failure to communicate a material fact without any purpose of de-

ceiving or misleading the other party, and even without having himself any knowledge of the fact, while not affecting the validity of the agreement at law, and not being sufficient ground in equity for its cancellation because not fraudulent, may still render the agreement so unfair, unequal, or hard that a court of equity, in accordance with its settled principles in administering the remedy of specific performance, will refuse to enforce the contract against the party who was misled. (2 Pom. Eq. Jur. § 905.)

We have carefully reëxamined the grounds upon which the opinion in this case proceeded, as well as the evidence, and we are entirely satisfied, in whatever light the same may be viewed, that the plaintiff is not entitled to the relief which he seeks.

The petition for a rehearing must therefore be denied.